UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHWESTERN DIVISION

| | |
|---|---|
| CYNTHIA ALLEN, } | |
| Plaintiff, } | |
| vs. } | CASE NO. CV 00-B-3178-NW |
| RENAISSANCE REALTY, INC., et al. } | |
| Defendants. } | |

# MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by defendant, Neese Real Estate, Inc. ("defendant" or "Neese"). Also before the court is defendant's Motion to Strike the Affidavits of Charlotte S. Dean, (Doc. 76), and Jim Bonner (Doc. 76), and the Addendum to plaintiff's affidavit, (Doc. 76), and defendant's Motion to Strike the Affidavits of Ed Knotts, (Doc. 81), and Sandra Johnson, (Doc. 81). Plaintiff, Cynthia Allen ("plaintiff" or "Allen"), an African-American and licensed realtor, claims that Neese refused to hire her as a real estate salesperson because of her race, in violation of 42 U.S.C. § 1981. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted, defendant's Motion to Strike the Affidavit of Charlotte S. Dean is due to be granted, and defendant's Motion to Strike the Affidavits of Ed Knotts and Sandra Johnson is due to be granted.

**SUMMARY JUDGMENT**

**I. FACTUAL SUMMARY**

**A. Summary of Hiring at Neese**

Jimmy Neese,[1] the current president and sole shareholder of Neese, took over control of Neese from his mother Shirley Neese at some point in 1993 or 1994. (Neese Dep. at 7-9.) At the time Jimmy Neese gave his deposition, Neese had not ever employed minority real estate salespersons. (*Id.* at 11-12.) Between January 1993 and December 2000, Neese hired nineteen new salespersons, but only one in 1999 and one in 2000.[2] (Resp. to Pl.'s First Interrog. at 3-4.) In August 1999, Neese acquired Lynn Bernauer, but only after Neese had lost four real estate salespersons in June and July of 1999. (*Id.*; Neese Dep. at 68-70.) Marguerite Preifer began working at Neese as a real estate salesperson in August 2000 after obtaining her license; she had been associated with Neese before that time as Shirley Neese's assistant. (Resp. to Pl.'s First Interr. at 4; Neese Dep. at 68-70.) Neese followed no formal procedure for hiring new salespersons. (Neese Dep. at 16-17.) However, of those Jimmy Neese remembers hiring to sell real estate,[3] he required letters of recommendation only from applicants he did not already

---

[1] Jimmy Neese will be referred to throughout this memorandum by his first and last name to avoid confusion with Neese Real Estate, Inc., which will be referred to as "Neese."

[2] Salesperson Bill Clemmons began working at Neese in June 1994, and salesperson Joey Mitchell began in December 1993, (Resp. to Pl.'s First Interr. at 3), but to the best of Jimmy Neese's recollection, Clemmons and Mitchell were employed at Neese before Jimmy Neese took over, (Neese Dep. at 78-79, 87). Accordingly, the number of salespersons Jimmy Neese hired is more than likely lower than nineteen. The court, however, uses January 1993 as a beginning date since Jimmy Neese can recall only that he took over control of Neese sometime during 1993 or 1994.

[3] Jimmy Neese does not remember what functions Bill Clemmons, Joey Mitchell or Jim Delano performed when they were hired. (*See* Neese Dep. at 78-79, 84-85, 87.) Paul Hughey and Allen Sorrell have real estate licenses, but they do not contribute to Neese by actively selling real

know.[4] The only salesperson Jimmy Neese hired that he did not know, Patsy Emmons, furnished letters of recommendation. (*Id.* at 88.) Also, Jimmy Neese required documentation of production only from experienced salesperson seeking to transfer their real estate license to Neese, as newly licensed salespersons would not yet have accumulated any production numbers.[5] (*See, e.g., id.* at 71.) The three established agents that transferred to Neese, Andy Griffith, Mary Griffith and Patsy Emmons, provided Jimmy Neese with some form of documentation of past production.[6] (*Id.* at 75-76, 88.)

**B. Facts Giving Rise to Plaintiff's Claim**

From 1991 to 1999, the plaintiff, Cynthia Allen, was affiliated with Coldwell Banker Ronald Warren Real Estate, Inc. ("Coldwell Banker") as a real estate salesperson. (Allen Dep. at 38-39.) Allen had previously obtained a real estate license from the State of Alabama which authorized her to represent individuals who wished to purchase or sell real estate. (*Id.* at 33.) Although Allen had been affiliated with Coldwell Banker for several years, she had come to the conclusion that she suffered from a lack of respect at the company and, in March 1999, decided to seek to become affiliated with another company. (*Id.* at 40, 60, 93-94.)

---

estate. (*Id.* at 77-78, 89.)

[4] Jimmy Neese was previously acquainted, and did not require letters of recommendation from: Angie Goode, Andy and Mary Griffith, Anne Olive, Buster Smith, Druann Kelly, David Massey, Doris Ross, Ginger Hovater, Jerry Penningtion, Lynn Bernauer, Mary Griffith, Marguerite Preifer, and his brother Kenny Neese. (Neese Dep. at 73-91.)

[5] Newly licensed salespersons included: Angie Goode, Anne Olive, Buster Smith, Druann Kelly, David Massey, Ginger Hovater, Jerry Pennington, Lynn Bernauer, Marguerite Preifer. (*See* Neese Dep. at 73-91.)

[6] Neese testified that he asked for letters of recommendation from another minority real estate salesperson who contacted him about a position. (Neese Dep. at 1317.)

3

In order to become affiliated with another company, Allen first needed to find one that would agree to accept the transfer of her real estate license. (*Id.* at 60.) To that end, she made inquiries of several real estate companies located in Florence and Muscle Shoals, Alabama, including Neese. (*Id.* at 58-59.)

Allen contacted Neese on several occasions and eventually arranged to meet with Jimmy Neese in March 1999. (*Id.* at 82-83, 90, 95-96, 147; Neese Dep. at 8-9.) Allen was interested in transferring her license immediately, and she conveyed this desire to Jimmy Neese's secretary prior to meeting with him. (Allen Dep. at 102.) At the time of this meeting in March 1999, Neese was in the process of moving its offices from a location on Dr. Hicks Boulevard, Florence, Alabama, to a downtown Florence location on Court Street. (Neese Dep. at 20-21, 23-24.) Consequently, Neese maintained temporary office space on Veterans Drive in Florence and it was at this temporary location where Allen and Jimmy Neese met to discuss her desire to become affiliated with Neese. (Allen Dep. at 147; Neese Dep. at 23.)

During this meeting, Allen recalls, Jimmy Neese "went on to tell me about his new office and something to the effect about other agents." (Allen Dep. at 147-48.) According to Jimmy Neese, "she did bring up the question about transferring her license to the company, and I believe I shared with her just the information that we were in temporary office space, and it was hard for me to make any decisions as to where we were headed at the time." (Neese Dep. at 26-27.) Prior to the March 1999 meeting, Jimmy Neese had never had any personal contact with Allen nor had he discussed her with any of his colleagues in the real estate industry. (*Id.* at 28.) Jimmy Neese did not ask her to supply him with any letters of reference or other documentation in March 1999 because the company was not adding new agents at that time. (*Id.* at 26-27.)

4

Shortly after her meeting with Jimmy Neese in March 1999, the Century 21 Clement Realty franchise in Russellville, Alabama ("Century 21 Russellville") agreed to accept the transfer of Allen's real estate license. (Allen Dep. at 125.) However, by May 1999, Allen had become discouraged by the lack of opportunity in the Russellville market and by the long commute from her home in Muscle Shoals. (*Id.* at 124-125, 330-332.) Consequently, she began contacting several Northwest Alabama real estate companies in the hope that one would agree to accept the transfer of her real estate license. Again, one of the companies Allen contacted was Neese. (*Id.* at 143.)

In September 1999, Allen telephoned Jimmy Neese, proposing transfer of her real estate license from Century 21 Russellville to Neese. (*Id.* at. 143-44; Neese Dep. at 42-44.) Allen recorded this conversation and produced a copy of the audio tape recording, as well as a transcript, during discovery. (Allen Dep. at 144; Tr. at 130-34.) The transcript reflects that this conversation took place four months prior to Neese's move into its permanent location. (Tr. at 133-34.) During the conversation, Allen inquired about the possibility of transferring her real estate license to Neese but maintaining a physical office at her home, as she understood at least one Neese salesperson had been doing. (Tr. at 131-32.) Jimmy Neese informed her that all of Neese's salespersons maintained office space at Neese headquarters and that he would be unable to consider bringing on another salesperson until the relocation was completed, as he was already anticipating that the Court Street location would not be large enough to accommodate all of Neese's present agents. (*Id.* at 132-34.) Jimmy Neese invited Allen to contact him again after approximately four months, by which time he anticipated having completed the relocation, and

5

explained to Allen that he would be very interested in discussing the matter with her at that time. (*Id.* at 133-34.)

In January 2000, Neese moved into its permanent offices on Court Street in downtown Florence, Alabama. (Neese Dep. at 34.) On or about May 30, 2000, Allen met with Jimmy Neese at the Court Street location. (*Id.* at 37-39.) During the May 2000 meeting, Jimmy Neese informed Allen that because he was not well-acquainted with her, he would need her to provide him with letters of recommendation from her past brokers and documentation regarding her sales production for the past two years. (*Id.* at 35-36.)

Two letters written by Allen to Jimmy Neese in June and July of 2000 reflect that she was attempting to gather the requested documentation but that she was having difficulty. (Letter from Allen to Neese of 6/20/2000; Letter from Allen to Neese of 7/13/2000.) However, Allen never furnished Neese with the documentation. (Allen Dep. at 177-78.) Allen had no further contact with Neese and has no personal knowledge that the decision not to accept her requested license transfer was motivated by her race. (Neese Dep. at 40; Allen Dep. at 170-71.)

Allen filed this action on November 8, 2000. (*See* Compl.) Her Complaint alleges that Neese was guilty of racial discrimination in failing to accept the transfer of her real estate license. (*Id.* ¶¶ 14-15, 19.) Allen also asserts similar claims against three other real estate agencies in Florence and Muscle Shoals. (*Id.* ¶¶ 11-3, 15, 19.)

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues

exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

Allen brings this action pursuant to 42 U.S.C. § 1981, which "prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts." *Ferrill v. Parker Group*, 168 F.3d 468, 472 (11th Cir. 1999). She alleges Neese refused to transfer her real estate license and, after its refusal, allowed a non-minority salesperson to transfer to its operation. (Compl. ¶ 14.)

The basis of liability on a § 1981 claim must be intentional discrimination, not merely disparate impact.[7] *Ferrill*, 168 F.3d at 472. "The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases." *Id.*

### A. Direct Evidence of Intentional Discrimination

Direct evidence of intentional discrimination satisfies the plaintiff's burden to make out her prima facie case. *Ferrill*, 168 F.3d at 472. The Eleventh Circuit Court of Appeals has "defined direct evidence as evidence, which if believed, proves [the] existence of [the] fact in issue without inference or presumption. Evidence that only suggests discrimination or that is subject to more than one interpretation does not constitute direct evidence." *Taylor v. Runyon*, 175 F.3d 861, 867 (11th Cir. 1999) (alteration in original) (citation omitted).[8]

Allen offers the following deposition testimony in support of her claim against Neese:

> Q:   So am I understanding your testimony here now that when you went and spoke to Neese Realty, before the transfer of your license to Century 21 Russellville, that you did speak with Mr. Neese personally on that occasion?
> A:   Yes, I did get him and spoke with him in his Veterans office on Veterans Drive. One to one.

---

[7] To the extent Allen attempts to recover for disparate impact under § 1981, *see* (Pl.'s Br. at 13), her claims against Neese fail as a matter of law. *See Gen. Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 386-90 (1982) (reviewing legislative intent and holding that § 1981 reaches only purposeful discrimination); *see also Larkin v. Pullman-Standard Div., Pullman, Inc.*, 854 F.2d 1549, 1561 (11th Cir. 1988), *overruled on other grounds by Swint v. Pullman-Standard, Inc.*, 493 U.S. 929, (1989) (stating plaintiff proceeding on a theory of disparate impact is limited to Title VII and cannot seek the broader § 1981 remedies and longer liability period).

[8] "'[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . .' will constitute direct evidence of discrimination." *Wascura v. City of South Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081-82 (11th Cir.1990)) (alteration in original) (citations omitted).

8

> Q: Tell me what took place during that conversation then.
> A: I shared with Jimmy that I would like to transfer my license to his firm. He went on to tell me about his mother and Betty Mullins and how they were successful. He went on to tell me about his new office and something to the effect about other agents.
> Q: What about other agents?
> A: Something about the effect that if he brought me on he would have a problem with getting other agents, something to that effect.
> Q: Okay, tell me specifically, ma'am because, you know, a little while ago you didn't even mention to me that Mr. Neese had spoken to you.
> A: Uh-huh (Affirmative).
> Q: So tell me just as specifically as you can everything you said to him and everything he said to you during the conversation that took place on Veterans Boulevard.
> A: After I met with him, he and I talked about me transferring my license and he began to talk about his mother being successful and Betty Mullins and other agents. And something to the effect about me coming on, I believe that was at that conversation. Something about other agents. I can't bring it all together. But if me coming on what about getting other agents, something to that effect. That's all that I can remember.
> Q: So all that you can remember is something to an effect -- something to an effect about other agents and bringing other people on?
> A: Uh-huh (Affirmative).
> Q: That you cannot give us anymore specific statement that Mr. Neese made than that?
> A: That's all that I can recall right now.

(Allen Dep. at 147-149.)

At best this passage may be read as ambiguous. Allen characterizes it as "Mr. Neese express[ing] concern about what effect taking her on would have in recruiting other agents," (Pl.'s Br. at 3.) Neither the statements themselves nor Allen's characterization of them, however, rise to the level of direct evidence of intentional discrimination. Allen's race is not ever mentioned or alluded to. The mere suggestion that Mr. Neese was concerned about what effect Allen joining Neese would have on other agents does not, standing alone, prove Neese acted with discriminatory intent.

9

## B. Circumstantial Evidence of Intentional Discrimination

### 1. Prima Facie Case

Absent direct evidence of discriminatory intent, the court's analysis is governed by the tripartite framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981). *See also Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998); *Turnes v. Amsouth Bank*, 36 F.3d 1057, 1060 (11th Cir. 1994). Under this framework, plaintiffs bear the initial burden of establishing a prima facie case of discrimination by showing

> (1) [she] was a member of a protected class; (2) [she] applied and was qualified for a position for which the defendant was accepting applications; (3) despite [her] qualifications, [she] was not hired; and (4) after [her] rejection the position remained open or was filled by a person outside [her] protected class.

*Schoenfeld v. Babbitt*, 168 F.3d 1257, 1267 (11th Cir. 1999) (citing *Welborn v. Reynolds Metals Co.*, 810 F.2d 1026, 1028 (11th Cir.1987) (per curiam)).

The plaintiff's burden is "not onerous," it is "minimal." *Richardson v. Leeds Police Dep't*, 71 F.3d 801, 806 (11th Cir. 1995) (citing *Burdine*, 450 U.S. at 253); *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524 (11th Cir.1994).

### a. Contacts in March and September of 1999

Assuming that Allen applied and was qualified for the position of real estate salesperson, the undisputed evidence is that Neese was not seeking applicants for such a position during March 1999 and September 1999. "Requiring a plaintiff to demonstrate that he or she unsuccessfully applied for a job necessarily implies that the plaintiff must demonstrate that there

was a job available for which the employer was seeking applications." *Rutstein v. Avis Rent-A-Car Systems, Inc.*, 211 F.3d 1228, 1238 n.19 (11th Cir. 2000).

On her own initiative, Allen set up an appointment with Jimmy Neese in March 1999 where she expressed interest in transferring her real estate license to Neese. Jimmy Neese told Allen at this meeting that "[Neese was] in temporary office space, and it was hard for [him] to make any decisions as to where [Neese was] headed at the time."[9] (Neese Dep. at 26-27.) In fact, Neese did not hire another real estate salesperson until five months after this meeting. (Resp. to Pl.'s First Interrog. at 3-4.) Neese hired Lynn Bernauer in August 1999, but only after it had lost four salespersons during June and July. (*Id.*) Shortly after the March 1999 meeting between Allen and Jimmy Neese, Allen successfully transferred her license to Century 21 Russellville. (Allen Dep. at 125.)

Again unsolicited, Allen telephoned Jimmy Neese in September 1999, expressing renewed interest in Neese. At the time of this conversation, Neese was still located in temporary offices, expecting to relocate in four months to its Court Street offices. (Neese Dep. at 34; Tr. at 132-34.) Jimmy Neese explained to Allen that he believed the Court Street offices were not big enough for the staff Neese already employed. (Tr. at 133.) Declining her request to transfer, he said, "I've got to [go] with what I already have, but, Cynthia, I am very interested in talking to you, but it will be after I get moved into my new building." (*Id.*) Neese did not hire another salesperson before moving four months later in January. (Resp. to Pl.'s First Interrog. at 3-4.)

---

[9] Allen's recollection of this meeting is very sparse on detail. In her deposition, she says that Jimmy Neese "went on to tell me about his new office and something to the effect about other agents." (Allen Dep. at 147-48.)

11

Although Allen's burden to prove her prima facie case is minimal, the court is of the opinion that she has not produced sufficient evidence to prove Neese was seeking applicants for a salesperson in March 1999 or September 1999. As this is an element of Allen's prima facie case, *see Rutstein*, 211 F.3d at 1238 n.19, she has not met her burden and cannot sustain her § 1981 claim based on the March and September 1999 contacts with Neese.

**b. Contact in May 2000**

The court will assume that Neese was seeking applicants for the position of salesperson during May 2000 when Allen contacted Jimmy Neese for a third time.[10] However, there are several deficiencies in the evidence plaintiff offers to support her prima facie case.

Allen took only the first steps in "applying" for a position as salesperson at Neese in May 2000. After Allen again expressed interest to Jimmy Neese in transferring her license to Neese, Jimmy Neese asked her to submit letters of recommendation from her last two real estate brokers, as well as information documenting her production over the past two years. (Neese Dep. at 35-36.) Allen acknowledges that she never provided Neese with either letters of recommendation or records documenting her production. Therefore, Allen never took adequate steps to apply for a position at Neese.

Furthermore, without providing the requested information, it was impossible for Jimmy Neese to know whether Allen was "qualified" for the position of salesperson at Neese. An employer is not required to assume an applicant is qualified for a specific position when the applicant does not comply with the employer's policy of requesting from the applicant

---

[10] Jimmy Neese invited Allen to contact him about transferring her real estate license to Neese after Neese moved to its Court Street offices. (Tr. at 133-34.)

12

information that the employer will review to determine whether the applicant is in fact qualified. Because Allen did not submit the required letters of recommendation and documentation concerning her production, there is insufficient evidence on which a reasonable jury could find that she was qualified for the position.[11]

In addition, plaintiff does not make out her prima facie case in another respect. Defendant never made an adverse employment decision regarding Allen. As understood by the parties after talking in May 2000, Allen was to submit requested information before Jimmy Neese would consider her for salesperson. (Letter from Allen to Neese of 6/20/2000; Letter from Allen to Neese of 7/13/2000; Neese Dep. at 35-36.) Allen never complied with Neese's request. (Allen Dep. at 177-78.) It was not until August 2000, three months after Allen and Jimmy Neese talked, that Neese added another salesperson to their staff. (Resp. to Pl.'s First Interrog. at 3-4.) Neese did not continue to seek applications for the position of salesperson between May and August. Rather, it filled the position from inside the company. Neese promoted Marguerite Preifer ("Preifer") to salesperson after she obtained her real estate license. (Neese Dep. at 69-70.) No reasonable juror could find that Jimmy Neese hired Preifer over Allen when Allen had yet to furnish a single letter of recommendation or any records of her sales history. The evidence Allen offers does not create a genuine issue of material fact that Neese hired another applicant for the position of salesperson.

Allen has failed to meet three elements of her prima facie case regarding the failure to hire after the May 2000 contact. She did not take adequate steps to apply for the position of

---

[11]Obviously, Neese should not be compelled to hire an applicant if the requested information, when furnished, reflects poorly on the applicant's personal and professional skills; in effect, Allen asks this court to impose such an obligation on Neese.

13

salesperson because she did not comply with Neese's requests for information. Absent such information, the court will not presume she was qualified to be a salesperson at Neese. Furthermore, Neese did not reject Allen and fill the position of salesperson with another applicant. Rather, it was waiting for Allen to provide letters of recommendation and records documenting her production history before deciding whether to hire her. Without adequate proof on each element tending to create a genuine issue of material fact, the court finds Allen has not proved her prima facie case and cannot sustain her § 1981 claim based on the May 2000 contact with Neese.

### 2. Burden-shifting Analysis

If plaintiff successfully establishes a prima facie case, the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. If defendant succeeds in carrying this burden, then the plaintiff must prove that the defendant's articulated reasons are a mere pretext for unlawful motives, in this case, race discrimination. *Burdine*, 450 U.S. at 253. If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

Even assuming Allen makes out her prima facie case, she fails to raise a genuine issue of material fact that the legitimate, non-discriminatory reasons articulated by Mr. Neese for not allowing Allen to transfer her real estate license to Neese were a mere pretext for intentional discrimination.

### a. Contacts in March and September of 1999

Jimmy Neese told Allen, in March 1999, that the company was not considering the addition of any salespersons. (Neese Dep. at 26-27.) Neese hired Lynn Bernauer five months later, in August 1999, but only then after the company lost four salespersons in June and July. (Resp. to Pl.'s First Interogg. at 3-4.) The next contact between Allen and Jimmy Neese was in September 1999, four months before Neese was to move into its Court Street offices. Jimmy Neese told her then that the company was not seeking new salespersons because he was unsure the space in the new building would be large enough to hold the staff currently employed by Neese. (Tr. at 132-34.) Jimmy Neese expressed interest in Allen, but asked her to contact him after Neese moved. (*Id.*)

The reasons articulated by Neese to explain why Allen was not hired are legitimate and non-discriminatory. As such, the burden shifts to Allen to produce evidence sufficient to create a genuine issue of material fact that Neese's articulated reasons are a mere pretext for intentional discrimination. However, Allen has offered no evidence on which a reasonable jury could find pretext with respect to these articulated reasons. Unfortunately for Allen, "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its action." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991) (citing *Carter v. Miami*, 870 F.2d 578, 585 (11th Cir.1989)) (alteration in original). Allen has not met her burden of creating a genuine issue of material fact that defendant's reasons for not hiring her in March or September of 1999 are a mere pretext for discrimination.

### b. Contact in May 2000

Jimmy Neese asked that plaintiff submit letters of recommendation from brokers she had previously worked with, as well as documentation of her sales productivity for the preceding two years. (Letter from Allen to Neese of 6/20/2000; Letter from Allen to Neese of 7/13/2000; Neese Dep. at 35-36.) Allen wrote Jimmy Neese on two occasions regarding this request. In her second letter, dated July 13, 2000, Allen explained that she was having difficulty getting the information. (Letter From Allen to Neese of 7/13/2000.) Allen acknowledges that she never provided Jimmy Neese with the requested information. (Allen Dep. at 177-78.) Jimmy Neese did not hear from Allen after July 13, 2000, until she filed suit against Neese and other real estate firms on November 8, 2000.

As evidence of pretext, Allen argues that Jimmy Neese "did not require references and sales data to [sic] most of the individuals hired by his firm, but he does require them of the one African American who applied, Ms. Allen." (Pl.'s Br. at 12.) Jimmy Neese oversaw the hiring of at least fifteen (15) licensed real estate salespersons at Neese. He required letters of recommendation from the only salesperson who applied that he did not personally know, Patsy Emmons. Also, he required documentation of prior production from the three experienced salespersons who transferred their licenses to Neese, Andy Griffith, Mary Griffith, and Patsy Emmons. Neese's policy of requesting additional information from certain salesperson-applicants is legitimate and non-discriminatory. Thus, the burden shifts to Allen to produce sufficient evidence creating a genuine issue of material fact that Jimmy Neese's request that Allen furnish letters of recommendation and records of past production was a mere pretext for intentional discrimination.

Allen has not met her burden. By requesting information from Allen, Jimmy Neese treated her the same as other similarly situated salesperson-applicants, specifically, Andy Griffith, Mary Griffith, and Patsy Emmons. Because Allen has not met her burden to create a genuine issue of material fact that the requests for information were a mere pretext for discrimination, defendant is entitled to judgment as a matter of law.

## MOTIONS TO STRIKE

Defendant has moved to strike the "Affidavits" of Charlotte Dean, Ed Knotts and Sandra Johnson on the ground that the Affidavits were not timely filed. Although these "Affidavits" were in fact untimely filed, the Motions to Strike are due to be granted on the merits.[12] Defendant also moves to strike the Affidavit of Jim Bonner and the Addendum by plaintiff to her affidavit. None of the statements allegedly made by Dean, Knotts, Johnson, Bonner or the plaintiff help plaintiff to create a prima facie case or establish pretext as to defendant's legitimate non-discriminatory reason for not hiring the plaintiff. Therefore, the Motions to Strike will be granted.

## CONCLUSION

For the reasons stated herein, the court is of the opinion that defendant's Motion for Summary Judgment, and defendant's Motions to Strike are due to be granted. An Order in accordance with this Opinion will be entered contemporaneously with this Opinion.

DONE this 24th day of March, 2003.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
United States District Judge

---

[12] The "affidavit" of Charlotte S. Dean is merely a letter not made under oath. The "affidavits" of Ed Knotts and Sandra Johnson are also submissions not made under oath.